IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EDGAR CORTES-CASTILLO, et al., | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-2093-BH |
| | § | |
| ONE TIME CONSTRUCTION TEXAS | § | |
| LLC, et al., | § | |
|     Defendants. | § | Consent Case[1] |

**MEMORANDUM OPINION AND ORDER**

Based on the testimony, evidence, post-hearing proposed findings of fact and conclusions of law, argument of counsel, and relevant authorities, the Court finds that the plaintiffs are entitled to relief on some claims, and that the defendants are not entitled to relief on their counterclaim.

**I.  BACKGROUND**

On September 1, 2021, Edgar Cortes-Castillo (Cortes-Castillo), Leonel Cortez-Suarez (Cortez-Suarez), Ivan Delgado-Valdez (Delgado-Valdez), and Ivan Delgado-Soriano (Delgado-Soriano) (collectively Plaintiffs), sued One Time Construction Texas LLC (OTTX), One Time Construction, Inc. (OTCA), and Shay Fretwell (Owner) (collectively Defendants). (*See* doc. 1.) They assert claims against Defendants for failure to pay overtime wages under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*; against OTTX and Owner for failure to pay minimum wages under the FLSA, or alternatively under the Texas Minimum Wage Act (TMWA), and for breach of contract; and against OTCA and Owner for failure to pay overtime wages in violation of California Labor Code § 510, California Industrial Welfare Commission (IWC) Wage Order No. 16 (Wage Order 16), and the California Unfair Competition Law (UCL), Cal. Bus. &

---

[1]On consent of the parties, by *Order of Transfer* filed November 17, 2021, this case was transferred for the conduct of all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c).

Prof. Code § 17200 *et seq.*, and to pay wages upon termination of employment in violation of California Labor Code § 203. (*Id.* at 7-11.)[2]

OTTX and Owner asserted a counterclaim for breach of contract against Plaintiffs for damages proximately caused by their failure to perform as contracted. (doc. 6 at 7.)

A bench trial was conducted on October 3-5, 2022. (*See* docs. 52-54.) Joint exhibits totaling over 1,400 pages were admitted, and testimony from Plaintiffs and Owner was presented. (*Id.*) Both parties filed post-trial proposed findings of fact and conclusions of law. (*See* docs. 56, 58.)

After consideration of the testimony and evidence presented during the hearing, the parties' post-hearing proposed findings of fact and conclusions of law, the arguments of counsel, and the relevant authorities, the following findings and conclusions are entered in accordance with Federal Rule of Civil Procedure 52(a).

## II.  FINDINGS OF FACT[3]

OTCA was a California construction business that was formed in 2000, and ceased business operations in January 2019. Throughout OTCA's existence, Owner was the sole owner and managing member, and he was the only person with decision-making power. OTCA primarily did residential remodeling work but it also took on some commercial remodeling jobs; it did not do new home construction. From at least 2015, OTCA's business operations were conducted out of Owner's home in California.

OTCA's employees were paid an hourly wage and worked Monday through Friday, from 8:00 a.m. to 5:00 p.m., with an hour lunch. Employees that missed a day during the week were

---

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

[3] To the extent any finding a fact is more properly characterized as a finding of law, or a conclusion of law is more properly characterized as a finding of fact, it is so adopted.

sometimes allowed to work on Saturdays to make up hours, but they could not work more than 40 hours a week or eight hours a day. Employees were not expressly prohibited from taking time off for other jobs while working for OTCA.

Employees were paid by check but sometimes received cash advances. OTCA had two pay periods per month: the first was for work performed from the first through the fifteenth, paid on the twentieth; and the second was from the sixteenth through the last day of the month, paid on the fifth of the following month.

Employees used a timekeeping application on their phones to record and report their hours to OTCA, and they were paid based on the hours reported. The application "time-stamped" when the employee actually clocked in and out each day and identified his location. Owner used the application to monitor employees and see where they were working. OTCA had a computer payroll system that kept time cards and records of reported time, expenses, and checks issued to employees.

From 2000 to 2016, Owner had direct oversight of OTCA's daily operations, including assigning and supervising work, scheduling, and payroll. He hired Cortes-Suarez to work for OTCA in 2006, Cortes-Castillo in 2011, and Delgado-Valdez in 2014. Throughout the entire time they worked for OTCA, they were classified as full-time employees and received W-2 forms.

In 2017, Owner's brother-in-law, Sheldon Smith (Supervisor), took over the day-to-day operations of OTCA, including the supervision of Cortes-Suarez, Cortes-Castillo, Delgado-Valdez, and its other employees. In the first part of 2018, Owner relocated to Texas, and Supervisor moved into his California home, from where he continued to operate OTCA.

In Texas, Owner attended several business meetings with construction industry professionals to learn about the requirements in Texas for starting and operating a construction management business. He had informal conversations with at least ten lawyers about how to determine whether

construction workers in Texas should be classified as employees or independent contractors, but he did not hire them or pay for legal advice. He was told that independent contractors provided their own tools and transportation and controlled when they started or finished their work.

Around summer 2018, Owner spoke with Cortes-Suarez, Cortes-Castillo, and Delgado-Valdez about moving to Texas to work for him building new homes. They would continue performing the same kind of construction work as in California, but with less regulations. The working relationship would be very similar to OTCA; Owner would direct them to job sites, assign tasks, oversee their work, and pay them hourly at the same or similar rate. He also agreed to reimburse them for their moving expenses and to pay them for driving his truck and boat to Texas.

In September 2018, Owner agreed to hire Delgado-Soriano, Delgado-Valdez's son, to work for OTCA in California and to also pay his moving expenses to Texas. Delgado-Soriano quit his restaurant job before accepting the job. Because Delgado-Soriano did not have any construction experience, he was assigned to work with Delgado-Valdez as his helper to get experience.

In late October 2018, Plaintiffs moved to Texas and immediately started doing construction work for Owner. They were initially paid from a bank account controlled by Owner based on the same pay schedule used in California. They continued to use the same timekeeping application to record and report their hours to Owner, and they were initially paid based on a similar pay schedule.

In December 2018, Supervisor moved to Texas and began working for OTTX. Supervisor would supervise and inspect Plaintiffs' work on occasion, but Owner remained in control over all of OTTX's business operations.

In January 2019, Owner filed the corporate formation documents for OTTX, designating himself as its sole member and manager. After OTTX was formed, Plaintiffs began receiving checks from OTTX for their work.

Owner selected and bid on all of OTTX's jobs, negotiated the pricing and payment terms for construction contracts, sourced and purchased building materials, rented equipment and machinery, obtained financing, and provided building plans. He also handled all the advertising and financing.

During the time Plaintiffs worked for OTTX, they worked as construction laborers and performed the same type of work as for OTCA in California, including plumbing, electrical, framing, painting, and tiling. Owner told them where to work and what to do. Plaintiffs used their own small tools and were responsible for their transportation to job sites. Plaintiffs were allowed to work side jobs and had leeway about working on bad weather days, but they notified Owner when taking days off work.

OTCA ceased business operations in early 2019. Even though OTCA still exists in good standing in California, it does not have any assets. When Supervisor moved out of Owner's California home and relocated to Texas, the home was leased to a former subcontractor, and OTCA's computer and employment records remained in the home's garage. In early 2020, the subcontractor stopped paying rent, but Owner was unable to evict him during the COVID-19 pandemic. The subcontractor eventually vacated the home in 2022, but the garage was empty and all the records were missing or destroyed.

In early 2019, Owner, on behalf of OTTX, entered into a residential construction contract with Scott Seitrich (Client) to build a new home. Client also obtained a construction loan from a local bank (Lender), which issued payments directly to OTTX for completed construction work. OTTX and Lender had a preexisting business relationship; OTTX used Lender as its bank and relied on Lender to obtain financing for other construction projects.

Plaintiffs worked with Owner on all phases of the home's construction. They helped with digging the footings, setting the forms, pouring concrete, installing and waterproofing windows,

applying stucco, installing the roof, plumbing, and pulling electrical. They also helped frame the house, but most of the framing work was done by Owner. Supervisor also worked on the home with Plaintiffs and occasionally oversaw their work when Owner was not around. He did woodwork and installed all the doors.

In late 2019, Owner discovered multiple leaks in different areas of the house when it was raining. Plaintiffs and Owner tried to troubleshoot the cause of the leaks to prevent future leaks, but were unsuccessful. Owner did not initially blame Plaintiffs for the leaks.

While the home was still under construction, in 2020, Client sued OTTX, Owner, and Lender in state court. The state petition alleged that Owner failed to construct the home according to industry standards, and that he and Lender fraudulently depleted construction loan funds and misappropriated those funds in connection with the home's construction. An inspection report concluded that the roof framing was "obviously deficient." Client later nonsuited the case against Owner and OTTX, and eventually reached a settlement with Lender. Owner or OTTX did not pay anything to Client in connection with the lawsuit, but OTTX did not receive payment for some past work on the home, and the construction contract was terminated. Lender ended its business relationship with Owner, and OTTX was unable to find another bank for future construction loans.

In 2019 and 2020, Plaintiffs also did some work on the construction of a new home owned by OTTX. They installed two window dormers and did exterior stucco work. Most of the construction work was done by other contractors. After the home was sold, the new owner contacted Owner about major leaks. Because the home was under warranty, OTTX was responsible for repairing those leaks. Owner did some initial repair work but had to hire a contractor to find and repair the source of the leaks. The dormers had to be removed and reinstalled, which required additional waterproofing and exterior stucco work.

6

Around February 2020, OTTX had cash flow issues; it began issuing Plaintiffs late and partial payments for their work and only partially reimbursed them for building materials they purchased. Owner promised to fully pay them after OTTX was paid for completed projects, and Plaintiffs continued to perform construction work for OTTX. In March 2020, OTTX experienced a slowdown in work due to the COVID-19 pandemic and the issues with Client's home. Plaintiffs continued working for OTTX, but they had to take on more side-work for other companies when OTTX did not have any work for them. When Plaintiffs complained about missing or partial payments, Owner told them they would be paid after OTTX's home was sold.

Owner now blames Plaintiffs for all construction deficiencies at both homes, but he never sent them a demand with a specific amount owed for damages.

Cortes-Castillo worked for OTCA from 2011 through December 2018, and for OTTX from January 2019 to July 12, 2020; he was paid $19.00 per hour.

Cortes-Suarez worked for OTCA from approximately 2006 to December 2018, and for OTTX from January 2019 to July 12, 2020. From 2017 to December 31, 2018, he was paid $16.00 per hour, and from January 1, 2019 until July 12, 2020, he was paid $18.00 per hour.

Delgado-Valdez worked for OTCA from 2014 through October 2018, and for OTTX from October 2018 until July 12, 2020; he was paid $20.00 per hour.

Delgado-Soriano worked for OTCA from approximately September 2018 to December 2018, and for OTTX from January 2019 to July 12, 2020; he was paid $15.00 per hour.

### III.  CONCLUSIONS OF LAW

A.    **Fair Labor Standards Act**

Under the FLSA, employers are required to pay employees at a rate of at least one and one-half times their regular rate for hours worked in excess of a forty-hour workweek. *See* 29 U.S.C.

§ 207(a)(1).  The FLSA also requires employers to pay their employees a statutory minimum hourly wage, which is currently $7.25 per hour. *See id.* § 206(a)(1). An employee bringing an action for unpaid minimum wages or overtime compensation must demonstrate by a preponderance of the evidence: (1) the existence of an employer-employee relationship during the unpaid periods claimed; (2) that he engaged in activities within the coverage of the FLSA; (3) that the employer violated the FLSA's minimum wage or overtime compensation requirements; and (4) the amount of wages or overtime compensation due. *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 379 (5th Cir. 2019) (citing *Johnson v. Heckmann Water Res. (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014)).

Here, it is undisputed that OTCA was an enterprise engaged in commerce within the meaning of the FLSA during 2017 through 2019, and that OTTX was an enterprise engaged in commerce within the meaning of the FLSA in 2019 and 2020. (doc. 37 at 5-6.)

### 1.      *Employer-Employee Relationship*

The FLSA broadly defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (noting that the FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles"). "To determine if a worker qualifies as an employee, [courts] focus on whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Faludi v. U.S. Shale Sols., L.L.C.*, 950 F.3d 269, 275 (5th Cir. 2020) (citing *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008)). Courts in the Fifth Circuit consider "five non-exhaustive factors," known as the *Silk*[4] factors, to guide this determination: "(1) the degree of control exercised by the

---

[4]*See United States v. Silk*, 331 U.S. 704 (1947).

alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship." *Hobbs v. Petroplex Pipe & Constr., Inc.*, 946 F.3d 824, 829 (5th Cir. 2020) (quoting *Hopkins*, 545 F.3d at 343). "These factors are not exhaustive, nor can they be applied mechanically to arrive at a final determination of employee status." *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1043 (5th Cir. 1987). "Rather, each factor is a tool used to gauge the *economic dependence* of the alleged employee, and each must be applied with this ultimate concept in mind." *Hobbs*, 946 F.3d at 829 (quoting *Hopkins*, 545 F.3d at 343) (emphasis original). "[I]t is not what [plaintiffs] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive." *Parrish*, 917 F.3d at 380 (emphasis original) (citations omitted).

### a.    OTTX

The parties dispute whether an employer-employee relationship existed between Plaintiffs and OTTX.

### (1)    Degree of Control

The first factor is the degree of control the alleged employer exercises over the workers. "Control is only significant when it shows [the worker] exerts such a control over a meaningful part of the business that [he] stands as a separate economic entity." *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 381 (5th Cir. 2019) (citations omitted). "The relevant determination is whether 'the worker has a viable economic status that can be traded to other companies, keeping in mind that lack of supervision of the [worker] over minor regular tasks cannot be bootstrapped into an appearance of real independence.' " *Hobbs*, 946 F.3d at 830 (quoting *id.*).

Here, Plaintiffs credibly testified that Owner told them where to work and what tasks needed

to be performed each day; that either Owner or Supervisor were regularly at the job sites to oversee their work; that Owner physically inspected their work a few times a week; and that they provided him daily progress updates and pictures. Plaintiffs never negotiated their hourly rate of pay, and their compensation was set entirely by OTTX. Owner also directed how Plaintiffs reported their hours, requiring them to use an application on their phones that had a "Bates stamp" for him to "actually see that they were on the job when they clocked in." (doc. 53 at 33.)  Even though Plaintiffs could control certain aspects of their work, like their work schedule and whether to work on bad weather days, their independence with respect to these minor business tasks is not sufficient to establish their economic independence. The evidence demonstrates that Plaintiffs did not have the kind of control over their work as one who "stands as a separate economic entity" from OTTX. *Parrish*, 917 F.3d at 381. The degree of control factor weighs in favor of employee status.

### (2)        Relative Investments

The second factor is "the extent of the relative investments of the worker and the alleged employer." *Hopkins*, 545 F.3d at 343. In evaluating this factor, courts utilize a "side-by-side comparison method" by comparing "each worker's *individual* investment to that of the alleged employer." *Parrish*, 917 F.3d at 382 (emphasis original). The relevant investments are "the amount the alleged employer and employee each contribute to the specific job the employee undertakes." *Thibault v. Bellsouth Telecommunications, Inc.*, 612 F.3d 843, 847 (5th Cir. 2010).

The evidence shows that OTTX paid for advertising, assumed the costs to rent the large machinery or equipment Plaintiffs used to do their jobs, purchased all building materials and supplies for each project, and bought the land for one of the new homes on which they worked. Plaintiffs testified that Owner also paid for their moving expenses to relocate to Texas. They used their own small tools and were responsible for their own transportation to the job sites. Owner

10

testified that Plaintiffs stored their tools in a van while at a job site, but it is not clear who owned the van or whether it was also used as a personal vehicle. *See Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 304 (5th Cir. 1998) ("Although the driver's investment of a vehicle is no small matter, that investment is somewhat diluted when one considers that the vehicle is also used by most drivers for personal purposes."). Even assuming that Plaintiffs invested their own vehicle for work, the investment amount incurred by each Plaintiff for tools and vehicles is far less than the overall investment and risk incurred by OTTX on the construction jobs they worked. The evidence shows that OTTX invested more money in each project compared to each Plaintiff's individual investment. *See Hopkins*, 545 F.3d at 344 (concluding that employer's "greater overall investment in the business scheme convinces us that the relative-investment factor weighs in favor of employee status"). The relative investments factor weighs in favor of employee status.

### (3)    Opportunity for Profit or Loss

The third factor is "the degree to which the worker's opportunity for profit or loss is determined by the alleged employer." *Hopkins*, 545 F.3d at 343 (citing *Herman*, 161 F.3d at 303). Courts generally look to see who "controlled the major determinants of the amount of profit which the worker could make." *Id.* at 344. "In evaluating this factor, it is important to determine how the workers' profits depend on their ability to control their own costs." *Hobbs*, 946 F.3d at 832 (quoting *Parrish*, 917 F.3d at 384).

The evidence shows that from January 2019 to approximately March 2020, Plaintiffs worked almost exclusively for OTTX. Owner assigned the jobs, fixed the hourly rate of pay, and paid them the same rate regardless of the task or project. While Plaintiffs were able to control their work schedule and number of hours worked, they had no control over the costs associated with work assignment. OTTX negotiated the construction contracts for the jobs Plaintiff worked, and all costs

11

for building materials and equipment rental were paid by OTTX or billed to each project.  Where, as here, Plaintiff's "only 'expenditures' from which they obtain a return is on their own labor, [s]uch returns are more properly classified as wages, not profits." *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1050 (5th Cir. 1987) (citation omitted) (cleaned up).

The evidence shows that Plaintiffs worked a full-time schedule for Owner the majority of the time, which "effectively prevented them from engaging in outside work." *Hobbs*, 946 F.3d at 833. They could do side jobs while working for OTTX, and they began taking more work from others when work for OTTX slowed down around March 2020, but their "year-end profits or losses did not depend on their ability to find [construction] work with other companies consistently or other work generally." *Hobbs*, 946 F.3d at 833 (citation omitted). The evidence demonstrates that Plaintiffs' profits were determined by the hours they worked for OTTX and the steady work it provided. *See Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 667 (5th Cir. 1983) (finding factor weighed towards employee status because workers' opportunity for profit was determined solely by employer's need for their work rather than their own initiative and planning). The opportunity for profit and loss factor weights in favor of employee status.

### (4)    Skill and Initiative

The fourth factor examines the skill and initiative required in performing the job. In evaluating it, courts consider whether the workers have "some unique skill set or some ability to exercise significant initiative within the business." *Hopkins*, 545 F.3d at 345. "Greater skill and more demonstrated initiative counsel in favor of [independent contractor] status." *Parrish*, 917 F.3d at 385. In contrast, "[r]outine work which requires industry and efficiency" and "skills that are not 'specialized' but rather are 'common' to all employees in that position counsel against [independent contractor] status." *Id.* "Relevant to the initiative inquiry is the extent of discretion the worker has

12

over his daily tasks and whether he must take initiative to find consistent work." *Hobbs*, 946 F.3d at 834 (citing *id.*).

Plaintiffs were laborers and provided general residential construction work: they painted houses, hung drywall, and performed electrical, plumbing, foundational, and framing work. None of them held a license or certification to perform the work for OTTX. Defendants contend that Plaintiffs "performed skilled construction work in Texas," but there is nothing in the record to suggest that their skills are "specialized" or not common for other construction laborers. (doc. 58 at 4.) While working for OTTX, Plaintiffs received work assignments from Owner every day and followed his instructions to complete their assigned tasks. They did not exert initiative to find consistent work with OTTX; their "initiative was limited once on the job." *Hobbs*, 946 F.3d at 834; *see, e.g., De Luna-Lopez v. A Lawn and Landcare Servs. Co., LLC*, 3:11-CV-1782-M, 2013 WL 4504767, *5 (N.D. Tex. July 29, 2013) (concluding that skill and initiative factor pointed to employee status where plaintiffs "had no specialized training and performed unskilled lawn care services on behalf of Defendants when and where they were told to do so"). The skill and initiative factor weighs in favor of employee status.

### (5)    Permanency

The fifth factor considered is "the permanency of the working relationship." *Hopkins*, 545 F.3d at 345. "Relevant to this factor is 'whether any plaintiff 'worked exclusively' ' for [the alleged employer], 'the total length of the relationship,' and 'whether the work was on a 'project-by-project basis.' " *Hobbs*, 946 F.3d at 834 (quoting *Parrish*, 917 F.3d at 387).

Plaintiffs worked for OTTX on a steady and reliable basis for over a year, and three Plaintiffs were previously employed by OTCA for at least four years in duration. *See Cromwell v. Driftwood Elec. Contractors, Inc.*, 348 F. App'x. 57, 61 (5th Cir. 2009) (per curiam) (finding eleven months

a substantial period of time); *see, e.g.*, *Martinez v. Ranch Masonry, Inc.*, No. CV H-16-3267, 2018 WL 1579476, at *4 (S.D. Tex. Apr. 2, 2018), *aff'd by* 760 F. App'x 288 (5th Cir. 2019) (finding permanency of an employment relationship where plaintiff had worked for two businesses with the same owners for combined period of four years). Although most had a longer working relationship with OTCA than OTTX, both companies were owned and operated by Owner, and Plaintiffs performed substantially similar work under his supervision while at both companies. *See Parrish*, 917 F.3d at 387 (noting that the time plaintiffs previously worked as employees for company is properly included as part of permanence analysis). Plaintiffs were paid hourly at the same rate, and not on a project-by-project basis, while working for both companies. *See Hobbs*, 946 F.3d at 835. Finally, Plaintiffs worked almost exclusively for OTTX during the relevant period, but when it stopped assigning them work and failed to pay them for past-performed work, they obtained work from other sources during the last few months they worked for it.

Generally, the permanency factor "weighs in favor of employee status when the work is done continuously and for a long period of time, but evidence that the worker provided similar services to others simultaneously weighs in favor of independent contractor status." *Lopez v. Reliable Clean-Up & Support Servs., LLC*, No. 3:16-CV-2595-D, 2018 WL 3609271, at *10 (N.D. Tex. July 27, 2018) (citing cases). As a matter of economic reality, Plaintiffs clearly depended on their relationship with OTTX for their livelihood. Considering the totality of the circumstances surrounding Plaintiffs' employment relationship with OTTX, the "insignificant work" Plaintiffs performed for others does not, without more, demonstrate independent contractor status. *See Robicheaux*, 697 F.2d at 666 (finding permanency factor weighed in favor of employee status where plaintiffs worked exclusively, "except for insignificant work elsewhere," with defendant for a "substantial period of time," spanning ten months to three years); *see also Cromwell*, 348 F. App'x

14

at 61 (finding permanency factor satisfied where plaintiffs' employment was "steady and reliable ... over a substantial period of time"). The permanency factor weighs in favor of employee status.

Plaintiffs have met their burden to establish by a preponderance of the evidence that they were employees of OTTX.

### b.    OTCA

It is undisputed that when Cortes-Castillo, Cortes-Suarez, and Delgado-Valdez were working for OTCA, they were its employees. As for Delgado-Soriano, the record shows that he had no control of his work while working for OTCA: he was assigned to work with Delgado-Valdez, an OTCA employee, as his assistant so he could learn construction on the job; his schedule and assignments were determined by OTCA; and his work was closely supervised. Delgado-Soriano did not provide his own tools while working for OTCA and his individual investment, if any, was minimal relative to the investment of OTCA. Delgado-Soriano's opportunity for profit or loss was controlled by OTCA, as Owner determined his hourly rate and number of hours worked. The skill required for Delgado-Soriano to perform his work as a construction helper was limited; he was a helper had no experience in construction and the necessary initiative was minimal. While Delgado-Soriano's only worked for OTCA for two months, he left an established job to work for OTCA, which suggests the emergence of an employment relationship. When considering the relevant facts in light of the *Silk* factors, the evidence establishes that, as a matter of economic reality, Delgado-Soriano was an OTCA employee.

Plaintiffs have met their burden to establish by a preponderance of the evidence that they were employees throughout the time they worked for OTCA.

### 2. *Joint Employment Relationship*

Under the FLSA, an employer is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Fifth Circuit has explained that the "remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications." *McLaughlin v. Seafood, Inc.*, 867 F.2d 875, 877 (5th Cir. 1989) (citations omitted). Its definition of employer "is sufficiently broad to encompass an individual who, though lacking a possessory interest in the 'employer' corporation, effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-a-vis its employees." *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 329 (5th Cir. 1993). Because the statute's definition of employer "contemplates the possibility of multiple employers," an "individual may be the employee of two or more employers at the same time." *Itzep v. Target Corp.*, 543 F. Supp.2d 646, 652 (W.D.Tex. 2008).

To determine whether an individual or entity is an employer under the FLSA, courts in the Fifth Circuit apply an "economic reality" test, which considers "whether the alleged employer: (1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014) (citing *Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012)). While "a party need not establish each element in every case," each alleged employer must satisfy the economic reality test. *Orozco*, 757 F.3d at 448 (citation omitted).

Here, Owner created, owned, and managed OTTX and OTCA. (doc. 52.) He testified that he was solely responsible for hiring and firing workers and maintaining employment records for OTTX and OTCA. (*Id.* at 89-92.) He "directed everything" at OTTX, directed Plaintiffs to job sites,

assigned them tasks, and inspected their work. (doc. 52 at 116.) The evidence shows that for OTTX and OTCA, Owner controlled the terms and conditions of Plaintiffs' employment, including determining their hourly rate, how they reported hours, when they were paid, and signing their checks. The economic reality test has been satisfied with respect to Owner, OTTX, and OTCA. *See Donovan v. Grim Hotel Co.*, 747 F.2d 966, 972 (5th Cir. 1984) ("The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages."). Because the evidence establishes that, as a matter of "economic reality," Owner was Plaintiffs' employer for FLSA purposes, he is a joint employer with OTTX and OTCA and may be held individually liable for FLSA violations.

### 3.      *FLSA Successor Liability*

Under the federal common law, successor liability is an equitable doctrine that imposes liability on an entity for its predecessor's obligations. *See Valdez v. Celerity Logistics, Inc.*, 999 F. Supp.2d 936, 940 (N.D. Tex. 2014). The doctrine derives from labor law principles and is an exception to the general rule that a successor company is not liable for the wrongs of its predecessor. *Rojas v. TK Commc'ns, Inc.*, 87 F.3d 745, 750 (5th Cir. 1996). "Although developed in the context of labor relations, the doctrine of successor liability has been extended to claims asserted under Title VII and related statutes." *Id.* "[T]he purpose of the doctrine is to ensure that an employee's statutory rights are not 'vitiated by the mere fact of a sudden change in the employer's business.' " *Id.* "The doctrine is generally applied in circumstances where, absent successor liability, an employer could complete a corporate sale that would extinguish its liability to the workers, and the workers would be powerless to stop it." *Valdez*, 999 F. Supp.2d at 940.

In *Rojas*, the Fifth Circuit adopted a nine-factor test for establishing successor liability in a

17

Title VII discrimination case:

> (1) whether the successor company had notice of the charge or pending lawsuit prior to acquiring the business or assets of the predecessor; (2) the ability of the predecessor to provide relief; (3) whether there has been a substantial continuity of business operations; (4) whether the new employer uses the same plant; (5) whether he uses the same or substantially the same work force; (6) whether he uses the same or substantially the same supervisory personnel; (7) whether the same jobs exist under substantially the same working conditions; (8) whether he uses the same machinery, equipment, and methods of production; and (9) whether he produces the same product.

87 F.3d at 750. "Under this test, 'the first two factors are critical,' and '[t]he remaining seven simply provide a foundation for analyzing the larger question of whether there is a continuity in operations and the work force of the successor and predecessor.' " *Valdez*, 999 F. Supp. 2d at 940 (quoting *id.*).

In *Powe v. May*, the Fifth Circuit assumed, without deciding, that the doctrine applies to the FLSA, and it identified the "three main criteria" for determining successor liability as "(1) a substantial continuity of business operations from the previous entity to its successor; (2) notice to the successor; and (3) the [predecessor's][5] ability to provide relief." 62 F. App'x 557 (5th Cir. 2003) (per curiam) (citing *Rojas*, 87 F.3d at 750). "Thus, the nine-factor test adopted in *Rojas* can largely be reduced to three factors: (1) whether the successor company had notice of the potential liability prior to acquiring the business or assets of the predecessor; (2) whether the predecessor has the ability to provide relief; and (3) whether there has been a substantial continuity of business operations between the predecessor and the successor." *Washington v. Patterson-UTI Energy, Inc.*, No. 5:16-CV-130-RP, 2016 WL 3081060, at *4 (W.D. Tex. May 31, 2016) (citing *Rojas*, 87 F.3d at 750). Although the Fifth Circuit has not decided whether the doctrine of successor liability applies

---

[5]Even though the panel decision referred to the successor's ability to provide relief, *Powe*, 62 F. App'x at 557, as explained in *Valdez*, the predecessor's ability is the actual factor identified from the multi-factor test adopted in *Rojas. See* 999 F. Supp.2d at 942 n.6.

in the context of FLSA claims, "district courts in this circuit have consistently found that the FLSA allows for successor liability." *Gutierrez v. I. Kunik Co.*, No. 7:15-CV-225, 2017 WL 11716101, at *3 (S.D. Tex. Aug. 16, 2017); *see Valdez*, 999 F. Supp.2d at 940-42 (citing cases).

Here, Plaintiffs have demonstrated that there was sufficient continuity of business operations between OTCA and OTTX to justify the imposition of successor liability on OTTX for their FLSA claims. The evidence demonstrates that OTTX had notice of OTCA's overtime violations; Owner owned and operated both entities and had imputed notice of OTCA's violations. Even though they operated in different states, both entities provided residential construction services, employed substantially the same workforce and supervisory personnel, and generally operated in the same manner. Plaintiffs performed the same kind of work under Owner's supervision and followed similar scheduling and payroll procedures for each entity. The evidence also shows that OTCA does not have any assets and ceased operations shortly after OTTX was formed. *See cf. Rojas*, 87 F.3d at 750 (successor liability not warranted where predecessor was "still a viable entity").

Defendants argue that OTTX did not execute an agreement to acquire OTCA and its assets, but they do not provide any authority showing that an agreed transfer of assets is prerequisite to successor liability under federal common law. *See Hatfield v. A+ Nursetemps, Inc.*, 651 F. App'x 901, 907 (11th Cir. 2016) (rejecting argument that a transfer of assets is required for FLSA successor liability); *see also SullDelgado-Valdez v. Running Waters Irrigation, Inc.*, 739 F.3d 354, 357 (7th Cir. 2014) (noting that the formal purchase of assets is not required to establish successor liability in the ERISA context).

The evidence demonstrates that OTTX had actual and imputed notice of overtime violations at OTCA, OTCA cannot provide an adequate remedy, and there was a substantial continuity of business operations between OTCA and OTTX. OTTX is liable under federal common law

19

successor liability for the violations of the FLSA committed by OTCA.

### 4.    Statute of Limitations

The FLSA provides for a two-year statute of limitations for violations of the FLSA that is extended to three years for willful violations of the statute. *See* 29 U.S.C. § 255(a). "To prove a willful violation, the plaintiff must establish that 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute.' " *Ramos v. Al-Bataineh*, 599 F. App'x 548, 551 (5th Cir. 2015) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). "Mere knowledge of the FLSA and its potential applicability does not suffice, nor does conduct that is merely negligent or unreasonable." *Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 F. App'x. 349, 360 (5th Cir. 2015) (citations omitted). An employer who acts without a reasonable basis for believing that it was complying with the FLSA or who fails to seek legal advice regarding its payment practices is merely negligent. *Id.* (citing *McLaughlin*, 486 U.S. at 134-35; *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1416 (5th Cir. 1990)). In contrast, an employer acts willfully when it "actually knew its pay structure violated the FLSA or ignored complaints that were brought to its attention." *Id.* (citing *Ikossi–Anastasiou v. Bd. of Supervisors of La. State Univ.*, 579 F.3d 546, 553 n.24 (5th Cir. 2009)).

Here, there is no credible evidence to suggest that any FLSA violation by Defendants was willful. Owner testified that he had at least a hundred meetings with business professionals about operating a construction management business in Texas.  At these meetings, he consulted with many attorneys about the differences between employees and independent contractors for purposes of the FLSA. Based on the advice he received, he believed that Plaintiffs qualified as independent contractors and that they were not subject to overtime payments. While some plaintiffs complained about not receiving overtime compensation, Plaintiffs fail to provide any evidence to show that

Owner actually knew that OTTX's pay structure violated the FLSA. Plaintiffs contend that Owner was familiar with the FLSA's overtime requirements and previously classified them as employees when they performed similar work in California, but "neither knowledge of the FLSA's potential applicability nor negligent or unreasonable conduct necessarily establishes willfulness." *Mohammadi v. Nwabuisi*, 605 F. App'x 329, 332 (5th Cir. 2015). Although the evidence shows that Owner has not paid Plaintiffs for some of the hours they worked in 2020, there is no credible evidence to suggest that Owner knew or showed reckless disregard that this was a violation of FLSA's minimum wage provision. It is undisputed that Owner was unable to pay Plaintiffs initially due to financial difficulties, and that he later withheld payment to offset the costs for repairing the damages he alleged were caused by their work. Nothing suggests that Owner suspected that this conduct violated the FLSA's minimum wage provision.

While Plaintiffs have demonstrated that they were not paid correct wages for overtime hours when they worked for OTCA, they have not presented sufficient evidence to show actual knowledge or reckless disregard of the FLSA and its overtime requirements. During the relevant time period, Supervisor oversaw OTCA's business operations, and there is no evidence that he ignored complaints about unpaid overtime compensation. Moreover, there is no evidence that Defendants had prior notice of potential FLSA violations in California or Texas. *See Ikossi–Anastasiou*, 579 F.3d at 553 (affirming court's determination that there was no evidence of willfulness in the context of the FLSA where plaintiff provided no evidence that defendant actually knew its pay structure violated the FLSA or ignored or failed to investigate complaints).

Because Plaintiffs have not met their burden of providing evidence sufficient to demonstrate willfulness or reckless conduct, their FLSA claims are subject to a two-year statute of limitations.

### a.    OTCA

Plaintiffs seek to recover unpaid overtime wages under the FLSA for the period they worked for OTCA from August 16, 2018 to December 31, 2018.

A cause of action under the FLSA accrues "at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed." *Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 271 (5th Cir. 1987). This case was filed on September 1, 2021. Any claim for unpaid overtime compensation or minimum wages that accrued prior to September 1, 2019 is untimely.

Owner testified that OTCA paid wages on the twentieth of the month for work performed from the first to the fifteenth of the month, and on the fifth of the month for work performed from the sixteenth through the last day of the prior month. (doc. 52 at 101.) He also testified that Plaintiffs were paid in the same manner when they began working for OTTX. (*Id.* at 103.) Because the final pay date for the period claimed by Plaintiffs was January 5, 2019, their FLSA claims against OTCA all accrued more than two years before they initiated this lawsuit. *See* 29 U.S.C. § 255; *Halferty*, 821 F.2d at 271.

Plaintiffs' FLSA overtime claims against OTCA are time-barred and they are not entitled to relief on those claims.

### b.    OTTX

Plaintiffs seek to recover unpaid overtime and minimum wage compensation under the FLSA for the period they worked for OTTX from January 1, 2019 to September 1, 2021. The first pay date after September 1, 2019, was September 5, 2019, for wages for hours worked after August 16, 2019. The claims for unpaid overtime and minimum wage compensation under the FLSA for hours worked prior to August 16, 2019, fall outside the two-year limitations period, so Plaintiffs are not entitled

to relief on those claims. They are entitled to recover on their unpaid wages for hours worked on or after August 16, 2019.

### 5.    *FLSA Violations*

An employee bringing an FLSA action for unpaid wages "has the burden of proving that he performed work for which he was not properly compensated." *United States Dep't of Lab. v. Five Star Automatic Fire Prot., L.L.C.*, 987 F.3d 436, 441-42 (5th Cir. 2021) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946) (superseded by statute on other grounds)). Where, as here, an employer has failed to maintain accurate payroll records, "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 456 (2016) (quoting *Anderson*, 328 U.S. at 687). Once the plaintiff has made this showing, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687-88. "If the employer fails to produce such evidence, the court may then award damages to the employee even though the result may only be approximate." *Id.*

The Fifth Circuit has emphasized that courts are to "assess employees' evidence under 'a lenient standard rooted in the view that an employer shouldn't benefit from its failure to keep required payroll records, thereby making the best evidence of damages unavailable.' " *Hobbs v. EVO Inc.*, 7 F.4th 241, 257 (5th Cir. 2021) (quoting *Five Star Automatic*, 987 F.3d at 440). "The evidence of hours worked need not be perfectly accurate as long as it provides a sufficient basis to calculate the number of hours worked." *Little v. Tech. Specialty Prod., LLC*, 940 F. Supp.2d 460, 470 (E.D. Tex. 2013) (citing *Marshall v. Mammas Fried Chicken, Inc.*, 590 F.2d 598, 599 (5th Cir.

1979)). "Estimates may come from representative testimony, and the '[t]estimony of some employees concerning the hours worked by groups of non-testifying employees is sufficient if those who do testify have personal knowledge of the work performed by those who do not.' " *Olibas v. Barclay*, 838 F.3d 442, 450 (5th Cir. 2016) (quoting *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1331 (5th Cir. 1985)).

The undisputed evidence establishes that OTTX did not maintain complete and accurate records of the number of hours each Plaintiff worked. Plaintiffs and Owner testified that Plaintiffs were not paid an overtime rate for the hours worked in excess of forty in a given workweek and that they have not been paid in full for all the hours they worked for OTTX. (doc. 52 at 105, 151.) Plaintiffs provide Cortes-Castillo's timecards from January 1, 2020 to March 31, 2020, from the timekeeping application used by employees to record and report hours to OTTX. (doc. 53 at 89-92; Ex. 17, J001166-69; J001216-22.) The timecards show the date, the check-in time, the check-out time, the total number of hours, and place or project of each day worked. (*Id.*) Plaintiffs also provide screenshot records from a different phone application, showing the date, number of hours, and location that Cortes-Castillo worked each day from July 16, 2019 to July 10, 2020. (Ex. 2.) Cortes-Castillo testified that he used this application to make a contemporaneous record of the number of hours he worked each day. (doc. 53 at 92-95.) The total hours listed for the period between January 1, 2020 and March 31, 2020 are the same for both applications. He testified that these records, along with the screenshots from the timekeeping application, represent the best recollection of the total hours he worked in a workday for OTTX. (*Id.*)

Plaintiffs also provide Delgado-Valdez's timecards for work performed from December 16, 2019 to July 15, 2020, which were created from the timekeeping application used by employees to record and report hours to OTTX. The timecards show the date, the check-in time, the check-out

24

time, the total number of hours, and place or project of each day worked. (*Id.*) Delgado-Valdez testified that the timecards are an accurate representation of his hourly work schedule and the hours worked and reported to OTTX. (doc. 53 at 161.) Plaintiffs also provide screenshots of records that Delgado-Valdez maintained to keep track of his works worked, amounts owed for materials purchased, and amounts already paid. (Ex. 16.)

Plaintiffs provide Delgado-Soriano's records of work performed for OTCA and OTTX from September 24, 2018 to May 8, 2020. (Ex. 3.) They are screenshots from the same application used by Cortes-Castillo to keep track of daily hours worked, and show the date, number of hours, and location that Delgado-Soriano worked each day. Delgado-Soriano testified that the hours appeared consistent with the hours he actually worked. (doc. 54 at 62-63.)

Cortes-Suarez testified that his work schedule was Monday through Saturday from 7:00 a.m. to 5:00 p.m. with an hour for lunch, and that he regularly worked more than 60 hours a week. The testimony from Plaintiffs and Owner demonstrate that Cortes-Suarez regularly worked with the other plaintiffs when they worked for OTTX.

Plaintiffs have established that they performed some work for OTTX which they were not properly compensated; they presented sufficient evidence to show the amount and extent of that work as a matter of a just and reasonable inference. Their evidence demonstrates that they worked for more than 40 hours per workweek and were not properly compensated for their overtime hours, and that they were not paid minimum wage for some of their work. Even though Plaintiffs do not have any records for Cortes-Suarez, the records from Cortes-Castillo provide a reasonable estimate of hours worked. *See Olibas*, 838 F.3d at 450. The reported time records, coupled with Plaintiffs' testimony and documentary evidence, are enough to establish "the amount and extent of that work as a matter of just and reasonable inference." *Harvill*, 433 F.3d at 441. Although Defendants dispute

25

the amount of hours Plaintiffs claim they worked, they have not rebutted Plaintiffs' approximations with any credible evidence.

Plaintiffs have met their burden to establish by a preponderance of the evidence that OTTX failed to pay them overtime and minimum wages owed in violation of the FLSA.

### 6.    *Liquidated Damages*

"An employer who violates the FLSA's minimum wage and overtime provisions is liable not only for the unpaid compensation but also for 'an additional equal amount as liquidated damages.' " *Portillo v. Kincaid Inc.*, 826 F. App'x 384, 385-86 (5th Cir. 2020) (quoting 29 U.S.C. § 216(b)). While the employee has the burden of proof on the issue of willfulness, the employer bears the "substantial burden" of demonstrating good faith and reasonable grounds for violating the FLSA. *Steele v. Leasing Enterprises, Ltd.*, 826 F.3d 237, 246 (5th Cir. 2016). "A district court may, 'in its sound discretion,' refuse to award liquidated damages if the employer demonstrates good faith and reasonable grounds for believing it was not in violation." *Dacar v. Saybolt, L.P.*, 914 F.3d 917, 931 (5th Cir. 2018) (quoting 29 U.S.C. § 260). "[G]ood faith requires some duty to investigate potential liability under the FLSA." *Barcellona v. Tiffany Eng. Pub, Inc.*, 597 F.2d 464, 469 (5th Cir. 1979). "If an employer suspects that it is out of compliance with the FLSA, it cannot act in good faith." *Steele*, 826 F.3d at 246 (cleaned up); *see Carmack v. Park Cities Healthcare, LLC*, 321 F. Supp.3d 689, 707 (N.D. Tex. 2018) ("The defense requires plain and substantial evidence of at least an honest intention to ascertain what the FLSA requires and to comply with it.") (citations omitted).

As a threshold matter, Defendants failed to plead good faith as an affirmative defense in their answer. *See Mack v. Avara Cmty. Health Servs., Inc.*, No. 3:13-CV-1976-P, 2016 WL 4801306, at *3 (N.D. Tex. Feb. 5, 2016) (explaining that "some courts have concluded that a failure to plead good faith as an affirmative defense waives that defense"); *Herrera v. JK & HE Bus., LLC*, No. CV

H-14-2986, 2016 WL 8193294, at *9 (S.D. Tex. Oct. 14, 2016) (granting plaintiffs' motion for summary judgment on affirmative defense of good faith because defendants failed to plead good faith in their answers).

Defendants have also not satisfied their burden to prove that the FLSA violations were in good faith, or that they had reasonable grounds for assuming they had complied with the FLSA. The undisputed evidence shows that Owner was familiar with the FLSA's overtime requirements and that he knew that Plaintiffs regularly worked more than forty hours a week for OTTX and OTCA without overtime compensation. Owner testified that he had general discussion with attorneys about FLSA requirements, but "[m]erely contacting an attorney, without evidence of seeking specific advice on and investigation into FLSA compliance, does not demonstrate a good faith reasonable belief in the legality of an employer's practices." *Ellis v. Viking Enterprises, Inc.*, No. SA-18-CV-00772-ESC, 2019 WL 6271784, at *5 (W.D. Tex. Nov. 22, 2019); *see Chapman v. A.S.U.I. Healthcare & Dev. Ctr.*, 562 F. App'x 182, 186 (5th Cir. 2014) (affirming district court's rejection of employer's good faith defense based on "bare agreement with counsel that [it] had spoken to an attorney and an unnamed consultant when forming its opinion that the plaintiffs were not employees" without any evidence of actual investigation into plaintiffs' employment status). The evidence also shows that Plaintiffs were not paid minimum wages for some hours worked for OTTX. Although Owner presented evidence of his inability to immediately pay Plaintiffs due to financial difficulties, the continued refusal to pay wages does not support a finding of reasonableness. Accordingly, Defendants fail to carry their "substantial burden" of showing a good faith defense to the assessment of liquidated damages.

Plaintiffs are entitled to liquidated damages, equal to the amount owed for unpaid overtime and minimum wages.

**B.** **Breach of Contract Claims**

Plaintiffs assert a breach of contract claim against OTTX for the wages owed. OTTX and Owner counterclaim for damages they allege were caused by Plaintiffs' work.

*1.* ***Plaintiffs' Claims***

"The essential elements of a breach of contract claim in Texas[6] are: (1) the existence of a valid contract; (2) breach of the contract by the defendant; (3) performance or tendered performance by the plaintiff; and (4) damages sustained by the plaintiff as a result of the defendant's breach. *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (citing *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.—Houston [14th Dist.] 2005, pet. denied)).

"In Texas, a contract for employment may be express or implied, oral or written." *Quinn v. Workforce 2000, Inc.*, 887 F. Supp. 131, 135-36 (E.D. Tex. 1995) (citing *Pioneer Casualty Co. v. Bush*, 457 S.W.2d 165 (Tex.Civ.App.–Tyler 1970, writ ref'd n.r.e.)).  Under Texas law, the statute of frauds bars oral contracts that cannot be completed within one year. TEX. BUS. & COM. CODE § 26.01(b)(6). Generally, an employment contract for an indefinite term falls outside the purview of the statute of frauds because it can be performed within one year. *See Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.*, 55 F.3d 181, 187 (5th Cir. 1995); *Goodyear Tire & Rubber Co. v. Portilla*, 836 S.W.2d 664, 669 (Tex. App.—Corpus Christi–Edinburg 1992), *aff'd by* 879 S.W.2d 47 (Tex. 1994) ("When the agreement does not specify how long it will last, so as to be indefinite, the term

---

[6]"It is a long-recognized principle that federal courts sitting in diversity cases 'apply state substantive law and federal procedural law.'" *Shady Grove Orthopedic Assoc., P.A., v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010) (quoting *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)). Here, the parties' contract involved construction services in Texas. *See De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1413 (5th Cir. 1995) (quoting *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984)) ("[T]he law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue."); *see also Faloona by Fredickson v. Hustler Magazine, Inc.*, 799 F.2d 1000, 1003 (5th Cir. 1986) (citing *Duncan*, 665 S.W.2d at 421) (contacts to take into account in determining the applicable law include the place of contracting and place of performance).

of employment is not presumed to be longer than for one year, so the Statute of Frauds does not apply."); *Gerstacker v. Blum Consulting Engineers, Inc.*, 884 S.W.2d 845, 849 (Tex. App.—Dallas 1994, writ denied) ("Indefinite-term employment contracts are considered performable within one year and therefore do not fall within section 26.01(b)(6) of the statute of frauds.").

Here, it is undisputed that Plaintiffs agreed to and did furnish labor to OTTX at an agreed upon hourly wage for an indefinite term, and that they have not been paid for all the hours they worked. The evidence shows that OTTX breached the contract by not compensating them at the agreed rate and by failing to pay them all their hours for work performed from January 16, 2020 through July 12, 2020. They are entitled to recover their promised wages in excess of the federal minimum wage from OTTX.

### 2. Defendants' Counterclaim

In Texas, a party breaches a contract by failing or refusing to perform a contractual obligation. *B & W Supply, Inc. v. Beckham*, 305 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2009, pet denied). Under Texas law, "damages for breach of contract are limited to 'just compensation for the loss or damage actually sustained.' " *Atrium Med. Ctr., LP v. Houston Red C LLC*, 595 S.W.3d 188, 192 (Tex. 2020) (quoting *Stewart v. Basey*, 245 S.W.2d 484, 486 (Tex. 1952)). "To recover damages for breach of contract, a plaintiff must show that he suffered a pecuniary loss as a result of the breach." *AZZ Inc. v. Morgan*, 462 S.W.3d 284, 289 (Tex. App.—Fort Worth 2015, no pet.). "Such losses must be the natural, probable, and foreseeable consequence of the defendant's conduct." *S. Elec. Servs., Inc. v. City of Houston*, 355 S.W.3d 319, 323-24 (Tex.App.—Houston [1st Dist.] 2011, pet. denied)). "A party may not recover damages for breach of contract if those damages are remote, contingent, speculative, or conjectural." *City of Dallas v. Villages of Forest Hills, L.P., Phase I*, 931 S.W.2d 601, 605 (Tex. App.—Dallas 1996, no

writ). "[T]he absence of a causal connection between the alleged breach and the damages sought will preclude recovery." *AZZ Inc.*, 462 S.W.3d at 289.

Under Texas law, lost profits damages are recoverable to redress a breach of contract if they are "proved through competent evidence with reasonable certainty." *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 148-49 (Tex. App.—Dallas 2012, no pet.). "While recovery of lost profits does not require that the loss be susceptible to exact calculation, the amount of the loss must be shown by competent evidence with reasonable certainty." *Great Pines Water Co., Inc. v. Liqui-Box Corp.*, 203 F.3d 920, 922 (5th Cir. 2000). "At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained." *Szczepanik v. First S. Tr. Co.*, 883 S.W.2d 648, 649 (Tex. 1994). "A plaintiff's failure to show either the existence or the amount of lost profits will necessarily prevent their recovery." *Burkhart Grob Luft und Raumfahrt GmbH & Co. KG v. E-Sys., Inc.*, 257 F.3d 461, 467 (5th Cir. 2001).

Here, Owner testified that OTTX did not have written contracts with Plaintiffs, but they were provided plans and expected to build those plans. Plaintiffs worked all phases of construction at Client's home, including installing and waterproofing all windows and framing part of the roof, but he claims their work was faulty because all the windows leaked and there were other leaks inside the home. Defendants submit pictures that show Plaintiffs working on the home as well as some of the window leaks. Owner testified that as a result of Plaintiffs' faulty work, he and OTTX were sued by Client, OTTX's construction contract was terminated, Lender ended its banking relationship with OTTX, and OTTX could not get loans for future construction projects. He claimed he had absolutely no role in any of the issues at Client's home, and that any problems were solely caused by Plaintiffs. Owner testified that Plaintiffs also performed deficient work at OTTX's home because both window dormers were not installed properly and leaked. He had to hire subcontractors to fix the water

30

damage to the ceiling and drywall and to remove and tear apart the dormers, remove the stucco, waterproof the windows, reinstall the dormers, and apply new stucco. He claimed that Plaintiffs were equally responsible for damages caused at both homes.

Defendants have failed to meet their burden to show by a preponderance of the evidence that Plaintiffs breached any contract with OTTX, or that damages to OTTX resulted from that breach. They have not provided sufficient evidence to show how Plaintiffs' work violated their agreement. Owner assigned Plaintiffs work at both jobs, supervised and inspected their work, and received daily updates and photographs of their work. While Owner testified that Plaintiffs were expected to follow plans, there was no first-hand testimony or documentary evidence showing work actually performed by Plaintiffs that failed to meet plan specifications. The home inspector who visited Client's home could not confirm whether the flashing and water barriers for the windows and stucco were installed correctly and recommended further testing. His property condition report concluded that roof framing was "obviously deficient", roof framing specifications needed to be obtained to fully document structural deficiencies, and a structural engineer needed to be consulted for remediation advice. Plaintiffs testified that all the framing work, including the roof, was performed by Owner and Supervisor. Owner testified that he performed most of the framing work, and that he, Supervisor, and Plaintiffs worked on the roof framing. His testimony about Plaintiffs causing the issues at Client's home and him not having any role is therefore not credible. Defendants have not demonstrated that Plaintiffs breached their contract, or that OTTX's damages are the natural, probable, and foreseeable consequences of their work. *See S. Elec. Servs.,* 355 S.W.3d at 323-24.

Defendants also fail to provide legally and factually sufficient evidence of damages from Plaintiffs' alleged breach. Owner testified that the damages OTTX incurred from Plaintiffs' work include the profits it would have made from finishing Client's home and from building other spec

31

homes in the past two years. He testified that Lender prevented OTTX from collecting $39,330 for past work at Client's home, and that it would have made $80,000 profit for extra work. He also testified that OTTX could have made $150,000 from its house, and that it could do two to three houses at a time with bank backing. There is no evidence to indicate how he arrived at these figures or whether they are based upon any objective facts, figures, or data. *Szczepanik*, 883 S.W.2d at 650 (finding testimony from company's executive that it expected to make a profit of $250,000 to $500,000 per year was "speculation," as there was nothing in the record to show how the amount was calculated). "Lost profits cannot be based on pure speculation or wishful thinking." *Peterson Group, Inc. v. PLTQ Lotus Group, L.P.*, 417 S.W.3d 46, 64-65 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

Owner also testified that it cost him at least $12,000 in labor and materials to repair the damages from Plaintiff's work on OTTX's house. He testified that the amount was based, in part, on his time fixing leak damage and amounts paid to hire other contractors to remove and reinstall the dormers, but no evidence was presented to show that such costs were "reasonable and necessary." *See Ashley v. Bizzell*, 694 S.W.2d 349, 354 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.) (finding evidence of amount expended to complete unfinished work without any evidence that expenses were "reasonable and necessary" was "incompetent" to prove damages). Owner claimed there were check stubs for the repairs, but they were not presented as evidence at trial. Even if they were provided, "[t]he fact of payment standing alone is no evidence that expenses were reasonable and necessary." *Ashley*, 694 S.W.2d at 354.

OTTX and Owner are not entitled to relief on their breach of contract counterclaim.

**C.   <u>California Overtime Wages</u>**

In California, wage and hour claims are "governed by two complementary and occasionally

overlapping sources of authority: the provisions of the Labor Code, enacted by the Legislature, and a series of 18 wage orders, adopted by the IWC." *Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th 1004, 1026 (2012). "The IWC, a state agency, was empowered to issue wage orders, which are legislative regulations specifying minimum requirements with respect to wages, hours, and working conditions." *Mendiola v. CPS Sec. Solutions, Inc.*, 60 Cal.4th 833, 838 (2015).

Labor Code § 510(a) provides in relevant part: "Eight hours of labor constitutes a day's work. Any work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek and the first eight hours worked on the seventh day of work in any one workweek shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee." IWC Wage Order 16 applies to "all persons employed in the on-site occupations of construction" and contains various provisions regarding work hours, overtime, minimum wage, meal and rest periods, and employer record keeping. *See* Wage Order 16, Cal. Code Regs. tit. 8, § 11160. Labor Code § 1194 provides a right to sue for unpaid minimum wages or overtime compensation.

The California Unfair Competition Law (UCL) prohibits business acts or practices that are unlawful, unfair, or fraudulent. *See* Cal. Bus. & Prof. Code § 17200. Under California law, "any business act or practice that violates the Labor Code through failure to pay wages is, by definition (§ 17200), an unfair business practice." *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal.4th 163, 178-79 (2000); *Sullivan v. Oracle Corp.*, 51 Cal.4th 1191, 1208 (2011) ("[T]he failure to pay legally required overtime compensation certainly is an unlawful business act or practice for purposes of the UCL.").

### 1.  *Statute of Limitations and Tolling*

The statute of limitations for an action for payment of wages due under Labor Code §§ 201 and 202 is three years. *See* Cal. Code Civ. Proc. § 338(a). The statute of limitations for claims under

the UCL is four years. *See* Cal. Bus. & Prof. Code § 17208. An employee seeking unpaid wages as restitution under the UCL "may avail himself or herself of the UCL's four-year limitations period, even if his or her claim for the underlying wage violation might be time-barred." *Ridgway v. Wal-Mart Stores, Inc.*, No. 08-CV-05221-SI, 2016 WL 1623907, at *2 (N.D. Cal. Apr. 25, 2016), *aff'd sub nom. by* 946 F.3d 1066 (9th Cir. 2020) (citing *Cortez v. Purolater Air Filtration Products Company*, 23 Cal. 4th 163, 178-79 (2000)).

Emergency Rule 9(a) provides that "[n]otwithstanding any other law, the statutes of limitations and repose for civil causes of action that exceed 180 days are tolled from April 6, 2020, until October 1, 2020." *See* Judicial Council of Cal., Emergency Rules Related to COVID-19, https://www.courts.ca.gov/documents/appendix-i.pdf (last accessed June 14, 2023). By its terms, the rule "intended to apply broadly to toll any statute of limitations on the filing of a pleading in court asserting a civil cause of action." *Palacios v. Interstate Hotels & Resorts Inc.*, No. 21-cv-05799-TSH, 2021 WL 4061730, at *3 (N.D. Cal. Sept. 7, 2021) (quoting Judicial Council of Cal., advisory comm. comment to emergency rule 9). Emergency Rule 9 has the practical effect of adding 178 days to unexpired statutes of limitations. *Palacios*, 2021 WL 4061730 at *3. Federal courts have consistently applied Emergency Rule 9 to toll the limitations period for California state law claims. *See Fin. Indem. Co. v. Messick*, No. 2:21-CV-01585-DAD-AC, 2023 WL 2696779, at *4 (E.D. Cal. Mar. 29, 2023) (citing cases).  It is likewise applied to extend the limitations period of Plaintiffs' California state law claims by 178 days.

Under California law, a cause of action for unpaid wages accrues when the wages first become legally due, i.e. on the payday for the period when the work was performed. *See Cuadra v. Millan*, 17 Cal.4th 855, 859 (1998), *disapproved on other grounds in Samuels v. Mix*, 22 Cal.4th 1, 16 n. 4 (1999) (actions for unpaid wages based on a wage liability created by statute must be brought

within three years after accrual under § 338(a)). Because Plaintiffs' claims for unpaid overtime under California law are subject to a four-year statute of limitations, they may recover for unpaid overtime for four years prior to the filing of this action. *See Cortez*, 23 Cal.4th at 178-79. Applying 178 days to UCL's four-year limitations period extends the date of accrual for unpaid overtime wages to March 7, 2017.[7] The first pay date after March 7, 2017, would be March 20, 2017, for wages for hours worked after March 5, 2017. Accordingly, Plaintiffs are entitled to recover on their unpaid wages for hours worked on or after March 5, 2017.

### 2. *Employment Relationship*

The parties do not dispute that Cortes-Castillo, Cortes-Suarez,[8] and Delgado-Valdez were employees when they worked for OTCA. Defendants argue that Delgado-Soriano was never employed by OTCA.

"[U]nder California law, once a plaintiff comes forward with evidence that he provided services for an employer, the employee has established a prima facie case that the relationship was one of employer/employee." *Narayan v. EGL, Inc.*, 616 F.3d 895, 900 (9th Cir. 2010) (citing *Robinson v. George*, 16 Cal.2d 238, 244 (1940)) ("The rule ... is that the fact that one is performing work and labor for another is prima facie evidence of employment and such person is presumed to be a servant in the absence of evidence to the contrary."). If a worker establishes a prima facie case, "the burden shifts to the employer, which may prove, if it can, that the presumed employee was an independent contractor." *Id.* (citing *Cristler v. Express Messenger Sys., Inc.*, 171 Cal. App.4th 72, 89 (2009)).

---

[7]Calculated by subtracting 178 days from September 1, 2021 (the filing date) to arrive at March 7, 2021, and then subtracting four years from that date to arrive at March 7, 2017.

[8]While Defendants dispute that Cortes-Suarez actually worked for OTCA during the period at issue, they admit that he was classified as an employee when he did work for OTCA.

Where, as here, the wage orders cover a worker's labor code claims, the three-factor ABC Test applies to determine if a worker qualifies as an independent contractor. *See Dynamex Operations W. v. Superior Ct.*, 4 Cal.5th 903, 916-17 (2018); *see also Roman v. Jan-Pro Franchising Int'l*, Inc., No. C 16-05961 WHA, 2022 WL 3052542, at *2 (N.D. Cal. Aug. 2, 2022) ("When a wage order encompasses a labor code claim (or a discrete issue within a claim), courts determine employee classification under *Dynamex* for purposes of that claim or issue."). Under the ABC Test, a worker qualifies as an independent contractor if three conditions are met:

> (A) the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of the work and in fact;

> (B) the worker performs work that is outside the usual course of the hiring entity's business; and

> (C) the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

*Id.* at 955-56.

Here, Delgado-Soriano and Delgado-Valdez testified that Owner hired Delgado-Soriano to work for OTCA in California, where he was assigned to work with Delgado-Valdez to receive on-the-job training in construction. Delgado-Soriano also provides documentary evidence of the hours he worked for OTCA. Testimony from Plaintiffs and Owner also show that, when compared to the circumstances of employment at OTTX, OTCA exercised more control over Plaintiffs' work. Plaintiffs have provided evidence establishing that Delgado-Soriano was an employee for OTCA.

Defendants have not met their burden to show that Delgado-Soriano meets all factors of the ABC Test to be considered an independent contractor. There is no evidence demonstrating that Delgado-Soriano was free from control and direction of Owner or Supervisor, that he performed work outside of the usual course of OTCA's business, and that he was not engaged in an

36

independently established trade of work performed by OTCA. *See Dynamex*, 4 Cal.5th at 955-56. Delgado-Soriano was an employee of OTCA under California law.

### 3.     *Failure to Pay Overtime*

Under California law, the plaintiff has the burden of proving he or she was not properly compensated for work performed. *Duran v. U.S. Bank Nat'l Assn.*, 59 Cal.4th 1, 40-41 (2014). "[W]hen an employer's records are inaccurate or incomplete, the employee carries this burden by proving the amount and extent of work performed 'as a matter of just and reasonable inference.' " *Id.* (quoting *Anderson*, 328 U.S. 687.) " 'The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.' " *Id.* "Under this burden-shifting framework, an employer is not allowed to benefit from its own poor recordkeeping." *Id.*

Here, OTCA did not have accurate records of the hours worked by Plaintiffs. Plaintiffs testified that their work schedule was Monday to Saturday, 7:00 a.m. to 5:00 p.m. with an hour for lunch, they typically worked 60 hours per week, and they were not paid overtime wages. They provided screenshots from the phone application Delgado-Soriano used to keep track of his hours that shows the date and number of hours he had worked each day for OTCA in California; it reflects that from September 24, 2018 to October 30, 2018, he was averaging 58.8 hours of work per week. (Ex. 2.) Delgado-Soriano testified that the screenshots were a contemporaneous record of the number of hours he worked each day, and that the number of hours were consistent with the hours he actually worked. (doc. 54 at 62-63.) Delgado-Soriano and Delgado-Valdez both testified that Delgado-Soriano assisted Delgado-Valdez during this period, and Cortes-Castillo testified that he

worked at OTCA during the same period. Cortes-Suarez testified that he was away on vacation for the majority of the time between September 24, 2018 and October 30, 2018, but he had regularly worked 60 hour weeks for the relevant period prior to September 24, 2018.

Plaintiffs have established that they performed overtime work for which they were not properly compensated as well as sufficient evidence to show the amount and extent of that work as a matter of a just and reasonable inference. They provide credible testimony that Cortes-Castillo, Delgado-Valdez, and Cortes-Suarez worked 60 hours a week from March 5, 2017 to September 23, 2018, and Delgado-Soriano's time records sufficiently approximate the number of hours worked by him, Delgado-Valdez, and Cortes-Castillo from September 24, 2018 to October 31, 2018.

### 4.    *Waiting Time Violations*

Under California law, if an employer willfully fails to pay an employee all of wages owed when the employee quits or is fired, the employer is required to continue paying the employee's wages at the same rate for thirty days as a penalty. Cal. Labor Code § 203. A "willful failure to pay wages ... occurs when an employer intentionally fails to pay wages to an employee when those wages are due." *Diaz v. Grill Concepts Services, Inc.*, 23 Cal. App.5th 859, 868 (2018) (quoting Cal. Code Regs. tit.8, § 13520). An employer does not act willfully when there is "a good faith dispute that any wages are due." Cal. Code Regs. tit. 8 § 13520. A "good faith dispute" is defined as "when an employer presents a defense, based in law or fact which, if successful, would preclude any recovery on the part of the employee. The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist." *Id.* § 13520(a).

Here, there is not sufficient evidence demonstrating that OTCA willfully failed to pay Plaintiffs the wages owed under California law. While there is some testimony that they generally complained about overtime pay at OTCA, the evidence does not support a finding of willful failure

38

by OTCA to pay them owed wages. Plaintiffs are not entitled to relief on their claim for waiting time penalties under Labor Code § 203.

### 5.    *Joint and Individual Liability*

The Labor Code provides that "[a]ny employer or other person acting on behalf of any employer, who violates, or causes to be violated, any provision regulating minimum wages or hours and days of work in any order of the Industrial Welfare Commission, or violates, or causes to be violated, Sections 203, 226, 226.7, 1193.6, 1194, or 2802, may be held liable as the employer for such violation." Cal. Lab. Code § 558.1(a). It defines "other person acting on behalf of an employer" as "a natural person who is an owner, director, officer, or managing agent of the employer." *Id.* § 558.1(b).

For the employer's owner to be held personally liable for Labor Code violations, he "must either have been personally involved in the purported violation of one or more of the enumerated provisions; or, absent such personal involvement, had sufficient participation in the activities of the employer, including, for example, over those responsible for the alleged wage and hour violations, such that the 'owner' may be deemed to have contributed to," and caused the violation. *Usher v. White*, 64 Cal.App.5th 883, 896-897 (2021). While "an individual must have engaged in some affirmative action beyond his or her status as an owner, officer or director of the corporation" to have "caused" a violation of the Labor Code, "that does not necessarily mean the individual must have had involvement in the day-to-day operations of the company, nor is it required the individual authored the challenged employment policies or specifically approved their implementation." *Espinoza v. Hepta Run, Inc.,* 74 Cal.App.5th 44, 59 (2022). "[T]o be held personally liable he or she must have had some oversight of the company's operations or some influence on corporate policy that resulted in Labor Code violations." *Id.*

39

The evidence establishes that Owner owned and operated OTCA, which he ran out of his home, and he was the only person with decision-making power during its existence. He was solely responsible for all of OTCA's employment policies and decisions, including payroll and scheduling, and for maintaining its business and employment records. Owner can be held personally liable for OTCA's Labor Code violations.

### 6.    *Successor Liability*

Plaintiffs generally assert that OTTX is liable for OTCA's California law violations as a successor entity.

As discussed, successor liability under the federal common law is an equitable doctrine that imposes liability on an entity for its predecessor's obligations. *See Valdez*, 999 F. Supp.2d at 940. While courts in the Fifth Circuit have found that successor liability applies to FLSA claims under federal common law, Plaintiff's FLSA overtime claims against OTCA are time-barred. Plaintiffs also rely on successor liability to hold OTTX liable for their California overtime claims, but they do not identify any cases imposing successor liability for state law claims based on federal common law successor liability. *See, e.g., E-Quest Mgmt., LLC v. Shaw*, 433 S.W.3d 18, 25 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (rejecting argument to extend successor liability found in federal common law to Texas employment discrimination claims).

Because the issue of successor liability implicates the internal affairs of OTTX, the issue is considered under Texas law. *See Askanase v. Fatjo*, 130 F.3d 657, 670 (5th Cir. 1997) ("Federal courts sitting in Texas apply the law of the state of incorporation when a corporation's internal affairs are implicated."). "Texas strongly embraces the general rule that a successor entity in an asset transfer is not liable for the grantor's liabilities." *In re 1701 Commerce, LLC*, 511 B.R. 812, 823 (N.D. Tex. 2014) (citing *E–Quest Mgmt. v. Shaw*, 433 S.W.3d 18, 22-24, (Tex. App.–Houston [1st

Dist.] 2013, pet. denied); *Lockheed Martin Corp. v. Gordon*, 16 S.W.3d 127, 139 (Tex. App.–Houston [1st Dist.] 2000, pet. denied)). The limited exceptions to the general rule are: (1) the successor expressly agrees to assume liability or (2) liability conferred by another statute. *See* TEX. BUS. ORGS. CODE § 10.254; *see also Farouk Sys., Inc. v. AG Glob. Prod., LLC*, No. CV H-15-0465, 2016 WL 1322315, at *7 (S.D. Tex. Apr. 5, 2016) ("[T]he only means by which successor liability may be imposed under Texas law against a transferee of assets are '(1) express assumption or (2) liability conferred by another statute.' ") (citations omitted).

Here, Owner testified that OTTX never executed an agreement to purchase OTCA or its assets or to assume OTCA's liabilities. Plaintiffs have not provided sufficient evidence to show OTTX expressly assumed liability for their California law wage claims against OTCA; nor have they identified a Texas statute conferring successor liability for violations of California's hour and wage laws. OTTX is not liable as successor for Plaintiffs' California law claims against OTCA.

**D.**    **Damages**

Plaintiffs attached to their post-trial brief a spreadsheet summarizing the number of hours each Plaintiff worked based on the testimony and evidence presented at trial. The rows show each seven-day workweek from the week ending March 5, 2017 to July 12, 2020. The columns show each workweek's total days worked, total hours actually worked, total hours less an hour for lunch, total overtime hours worked, and applicable regular pay rate, as well as calculations of amounts owed for unpaid overtime, unpaid minimum wages, and unpaid contracted wages. The spreadsheet also includes a chart calculating the total amount of damages owed to plaintiffs for each claim based on different statutes of limitations.   The chart does not include the formulas used to calculate the damage amounts or the total number of hours used to calculate each damage figure.

The spreadsheet provides the total number of hours worked in weekly increments, but

Plaintiffs were paid on the fifth and twentieth each month. Because Plaintiffs' wage claims accrue on the payday for the hours of performed work, and the accrual dates for their claims do not align with the workweek periods in the chart, a reasonable and just inference for determining hours worked on those weeks is to calculate the daily average of hours worked for that week and use that average for the days from that week until the next pay day to determine the total number of hours that will be used to calculate unpaid overtime wages.

### 1.    *Cortes-Castillo*

Cortes-Castillo is awarded $2,368 for unpaid overtime and minimum wages,[9] $2,368 in liquidated damages, and $3,233.80 in actual damages for his breach of contract claim,[10] against OTTX and Owner. He is also awarded $11,023.80 for unpaid overtime wages[11] against OTCA and Owner.

### 2.    *Delgado-Valdez*

Delgado-Valdez is awarded $1,768.63 for unpaid overtime and minimum wages,[12] $1,768.63

---

[9]The evidence shows that Cortes-Castillo was paid $10,300 for work performed from January 16, 2020 through July 12, 2020, and that his regular hourly rate was $19.00, which means he received payment for 542.11 hours during that period ($10,300 / $19.00). The evidence also shows that his total hours worked for this period was 712.3, including 78 hours of overtime, which means he has not been paid for 170.2 hours of work (712.3 hours - 542.11 hours). Cortes-Castillo is owed $741 in unpaid overtime (calculated by multiplying the 78 overtime hours by his $9.50 time-and-a-half rate) and $668.45 in unpaid minimum wages (calculated by multiplying the remaining 92.2 hours by the $7.25 minimum wage) for a total amount of $1,409.45. The evidence also establishes that from August 16, 2019 through January 15, 2020, Cortes-Castillo worked 100.9 overtime hours but was paid at his regular hourly rate. He is also owed overtime in the amount of $958.55 (calculated by multiplying the 100.9 overtime hours by his $9.50 half-time rate). The total amount of unpaid wages owed under the FLSA is $2,368.

[10]The total amount of unpaid wages owed for his breach of contract claim is $3,233.80 (calculated by multiplying 170.2 hours by his $19.00 rate).

[11]The evidence establishes that for the period from March 7, 2017 through October 30, 2018 Cortes-Castillo was not paid for 1,160.4 hours of overtime work in California and is owed overtime in the amount of $11,023.80 (calculated by multiplying the 1,160.4 overtime hours by his $9.50 half-time rate).

[12]The evidence shows that Delgado-Valdez was paid $10,800 for work performed from January 16, 2020 through July 12, 2020, and that his regular hourly rate was $20.00, which means he received payment for 540 hours during that period ($10,800 / $20.00). The evidence also shows that his total hours worked for this period was 679.9,

in liquidated damages, and $2,798 in actual damages for his breach of contract claim,[13] against OTTX and Owner. He is also awarded $11,604 for unpaid overtime wages[14] against OTCA and Owner.

### 3.    Delgado-Soriano

Delgado-Soriano is awarded $1,410.25 for unpaid overtime and minimum wages,[15] $1,410.25 in liquidated damages, and $2,109 in actual damages for his breach of contract claim,[16] against OTTX and Owner. He is also awarded $600.75 for unpaid overtime wages[17] against OTCA and Owner.

_____

including 59.4 hours of overtime, which means he has not been paid for 139.9 hours of work (679.9 hours - 540 hours). He is owed $594 in unpaid overtime (calculated by multiplying the 59.4 overtime hours by his $10.00 half-time rate) and $583.63 in unpaid minimum wages (calculated by multiplying the remaining 80.5 hours by the $7.25 minimum wage) for a total amount of $1,177.63. The evidence also establishes that from August 16, 2019 through January 15, 2020, Delgado-Valdez worked 59.1 overtime hours but he was paid at his regular hourly rate. He is also owed overtime in the amount of $591 (calculated by multiplying the 59.1 overtime hours by his $10.00 half-time rate). The total amount of unpaid wages owed under the FLSA is $1,768.63.

[13]The total amount of unpaid wages owed for his breach of contract claim is $2,798 (calculated by multiplying 139.9 hours by his $20.00 rate).

[14]The evidence establishes that for the period from March 7, 2017 through October 30, 2018 Delgado-Valdez was not paid for 1,160.4 hours of overtime work in California and is owed overtime in the amount of $11,604 (calculated by multiplying the 1,160.4 overtime hours by his $10.00 half-time rate).

[15]The evidence shows that Delgado-Soriano was paid $4,981.00 for work performed from January 16, 2020 through July 12, 2020, and that his regular hourly rate was $15.00, which means he received payment for 332.1 hours during that period ($4,981 / $15.00). The evidence also shows that his total hours worked for this period was 472.7, including 21.6 hours of overtime, which means he has not been paid for 140.6 hours of work (472.7 hours - 332.1 hours). He is owed $162 in unpaid overtime (calculated by multiplying the 21.6 overtime hours by his $7.50 half-time rate) and $862.75 in unpaid minimum wages (calculated by multiplying the remaining 119 hours by the $7.25 minimum wage) for a total amount of $1,024.75. The evidence also establishes that from August 16, 2019 through January 15, 2020, Delgado-Soriano worked 51.4 overtime hours but he was paid at his regular hourly rate. He is also owed overtime in the amount of $385.50 (calculated by multiplying the 51.4 overtime hours by his $7.50 half-time rate). The total amount of unpaid wages owed under the FLSA is $1,410.25.

[16]The total amount of unpaid wages owed for his breach of contract claim is $2,109 (calculated by multiplying 140.6 hours by his $15.00 rate).

[17]The evidence establishes that for the period from September 10, 2018 through October 30, 2018 Delgado-Soriano was not paid for 80.1 hours of overtime work in California and is owed overtime in the amount of $600.75 (calculated by multiplying the 80.1 overtime hours by his $7.50 half-time rate).

### 4.    Cortes-Suarez

Cortes-Suarez is awarded $3,489.30 for unpaid overtime and minimum wages,[18] $3,489.30 in liquidated damages, and $6,069.60 in actual damages for his breach of contract claim,[19] against OTTX and Owner. He is also awarded $8,792 for unpaid overtime wages[20] against OTCA and Owner.

## E.    **Attorney's Fees**

Plaintiffs also request attorney's fees and costs under 29 U.S.C. § 216(b), Chapter 38 of the Texas Civil Practice and Remedies Code, California Labor Code §§ 218.5 and 1194, and California Business and Professions Code § 17200, *et seq. See Singer v. City of Waco, Tex.*, 324 F.3d 813, 829 (5th Cir. 2003) (citing 29 U.S.C. § 216(b)) ("The FLSA requires an employer who violates the statute to pay attorney's fees."). An appropriate fee award is calculated using the lodestar method. *Singer*, 324 F.3d at 829. Plaintiffs may therefore seek attorney's fees and costs under Federal Rule of Civil Procedure 54(d)(2).

---

[18]The evidence shows that Cortes-Suarez was paid $6,752.00 for work performed from January 16, 2020 through July 12, 2020 and that his regular hourly rate was $18.00, which means he received payment for 375.1 hours during that period ($6,752 / $18.00). As discussed, the time records of Cortes-Castillo provide a reasonable estimate of Cortes-Suarez's hours for purposes of calculating unpaid wages. A reasonable estimate of his total hours worked for this period was 712.3, including 78 hours of overtime, which means he has not been paid for 337.2 hours of work (712.3 hours - 375.1 hours). He is owed $702 in unpaid overtime (calculated by multiplying the 78 overtime hours by his $9.00 half-time rate) and $1,879.20 in unpaid minimum wages (calculated by multiplying the remaining 259.2 hours by the $7.25 minimum wage) for a total amount of $2,581.20. The representative evidence reasonably estimates that from August 16, 2019 through January 15, 2020, Cortes-Suarez worked 100.9 overtime hours but he was paid at his regular hourly rate. He is also owed overtime in the amount of $908.10 (calculated by multiplying the 100.9 overtime hours by his $9.00 half-time rate). The total amount of unpaid wages owed under the FLSA is $3,489.30.

[19]The total amount of unpaid wages owed for his breach of contract claim is $6,069.60 (calculated by multiplying 337.2 hours by his $18.00 rate).

[20]The evidence establishes that from March 7, 2017 through September 24, 2018 Cortes-Suarez was not paid for overtime work in California and is owed overtime in the amount of $8,792 (calculated by multiplying the 1,099 overtime hours by his $8.00 half-time rate).

## IV.  CONCLUSION

Plaintiffs established by a preponderance of evidence that Defendants violated the FLSA and California law and breached their contract; they are entitled to relief on their claims against OTTX and Owner for failure to pay overtime and minimum wages under the FLSA and for breach of contract, and on their claims against OTCA and Owner for failure to pay overtime wages in violation of Labor Code § 510, Wage Order 16, and the UCL; and they shall take nothing on their claims against OTCA and Owner for FLSA overtime violations in California or for waiting time penalties under Labor Code § 203.

Plaintiffs are entitled to judgment in favor against Defendants for damages as follows:

(1) Cortes-Castillo is awarded $2,368 for unpaid overtime and minimum wages, $2,368 in liquidated damages, and $3,233.80 in actual damages for his breach of contract claim, against OTTX and Owner. He is also awarded $11,023.80 for unpaid overtime wages against OTCA and Owner.

(2) Delgado-Valdez is awarded $1,768.63 for unpaid overtime and minimum wages, $1,768.63 in liquidated damages, and $2,798 in actual damages for his breach of contract claim, against OTTX and Owner. He is also awarded $11,604 for unpaid overtime wages against OTCA and Owner.

(3) Delgado-Soriano is awarded $1,410.25 for unpaid overtime and minimum wages, $1,410.25 in liquidated damages, and $2,109 in actual damages for his breach of contract claim, against OTTX and Owner. He is also awarded $600.75 for unpaid overtime wages against OTCA and Owner.

(4) Cortes-Suarez is awarded $3,489.30 for unpaid overtime and minimum wages, $3,489.30 in liquidated damages, and $6,069.60 in actual damages for his breach of contract claim, against OTTX and Owner. He is also awarded $8,792 for unpaid overtime wages against OTCA and Owner.

Defendants failed to prove their counterclaim for breach of contract and damages by a preponderance of the evidence, and they shall take nothing on their counterclaim against Plaintiffs.

**SO ORDERED** on this 17th day of July, 2023.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE